United States District Court
Southern District of Texas
**ENTERED**
August 17, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LEO J. TRAYLOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:21-CV-00058 |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Leo J. Traylor filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny his application for Social Security disability benefits. Now pending are Traylor's and the Commissioner's construed cross-motions for summary judgment. (D.E. 15, 16). Traylor contends that residual functional capacity ("RFC") determination made by the Administrative Law Judge ("ALJ") is not supported by substantial evidence because she failed to properly evaluate the opinion of a psychological examiner. For the reasons discussed further below, it is respectfully recommended that Traylor's motion (D.E. 15) be **DENIED**, the Commissioner's motion (D.E. 16) be **GRANTED**, and Traylor's cause of action be **DISMISSED**.

## I.   JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Traylor resides in Jim Wells County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II.   BACKGROUND & ADMINISTRATIVE RECORD

### a.   *Application and Hearing*

In April 2019, Traylor filed an application for disability insurance benefits, alleging a disability commencing on December 1, 2015.  (D.E. 9-7 at 18).  Traylor claimed that his knee problem, high blood pressure, and depression limited his ability to work.  (*See, e.g.,* D.E. 9-4 at 4).  The Commissioner denied Traylor's application both initially and on reconsideration.  (*Id.* at 2, 42).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Joel Forgus concluded on July 28, 2019, that Traylor's severe impairments included:  (1) dysfunction of major joints;  (2) osteoarthritis and allied disorders; (3) depressive, bipolar, and related disorders; and (4) anxiety and obsessive-compulsive disorders.  (*Id.* at 10).  He concluded that, as a result of the mental impairments, Traylor had moderate limitations in all four of the Paragraph B criteria, including his ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage himself.  (*Id.*).  When evaluating Traylor's mental RFC, Dr. Forgus found moderate and marked limitations in several sub-areas of each of the Paragraph B criteria, but ultimately concluded that Traylor could "understand, remember, and carry out only simple instructions, make simple decisions,

2

attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings." (*Id.* at 14-16).

In the Disability Determination Explanation at the reconsideration stage in November 2019, Dr. Judy Martin concluded that Traylor's severe impairments included: (1) dysfunction of major joints; (2) osteoarthritis and allied disorders; (3) essential hypertension; (4) obesity; (5) sleep-related breathing disorders; (6) depressive, bipolar, and related disorders; and (7) anxiety and obsessive-compulsive disorders. (*Id.* at 30). She concluded that, as a result of the mental impairments, Traylor had moderate limitations in all four of the Paragraph B criteria. (*Id.*). When evaluating Traylor's mental RFC, Dr. Martin reached the same conclusions as Dr. Forgus. (*Id.* at 36-38).

At a hearing before the ALJ on April 9, 2020, Traylor testified to the following. He became nervous when he was around other people. (D.E. 9-3 at 67). He started sweating and thought someone might try to do something to him. As a result, he did not go around other people. He left his house when he had a doctor's appointment and sometimes went shopping with his wife. (*Id.*). He had panic attacks, even when at a doctor's appointment, but found ways to avoid being around other people. (*Id.* at 69). Sometimes he had to leave the waiting room. (*Id.*). The medications he took affected his ability to concentrate and made him fall asleep. (*Id.* at 71).

A vocational expert identified Traylor's past relevant work as a gate guard. (*Id.* at 74). The ALJ asked the vocational expert whether a person with the same age, education, and work experience as Traylor could perform his past work if they also: (1) could perform only sedentary work; (2) must be able to stand for one to three minutes per hour; (3) could

3

occasionally climb ramps, stairs, and banisters, but never climb ladders, ropes, or scaffolds; (4) could occasionally stoop, kneel, and crouch; (5) could never work at unprotected heights or around dangerous moving machinery; (6) could occasionally reach overhead and frequently handle, finger, and feel with the bilateral upper extremities; (7) could occasionally operate foot controls but could not be required to drive a vehicle; (8) had to wear a knee brace while at work; (9) could have no more than occasional concentrated exposure to extreme heat and humidity or extreme cold; (10) could not ambulate on uneven or rough terrain; (11) could not have more than occasional concentrated exposure to bright or flashing lights or loud industrial-level noise; (12) could understand, remember, and carry out simple instructions and perform simple work-related tasks, such as those involved in SVP 1 or 2 work;  and (13) could have frequent interaction with supervisors, coworkers, and the general public.  (*Id.* at 75).  The vocational expert responded that the hypothetical individual could not complete Traylor's past relevant work.  (*Id.* at 76).  However, he could perform the jobs of document preparer, cutter-paster, and surveillance system monitor.  (*Id.* at 76-77).

The ALJ then asked a second hypothetical where the individual could only have occasional interaction with supervisors and coworkers and no interaction with the general public.  (*Id.* at 77).  The ALJ clarified that this meant the individual could be in the presence of the public but would not have to interact with them.  The vocational expert responded that the individual could still do all three jobs previously identified.  (*Id.*).  In a third hypothetical, the ALJ added that the individual required a cane to ambulate.  (*Id.* at 77-78). The vocational expert responded that all three jobs would still be available.  (*Id.* at 78).  In

4

a fourth hypothetical, the ALJ added that the individual required a rolling walker to ambulate.  The vocational expert responded that all three jobs would still be available. (*Id.*).  In a fifth hypothetical, the ALJ added that the individual required a wheelchair to ambulate.  (*Id.* at 78-79).  The vocational expert responded that all three jobs would still be available.  (*Id.* at 79).

In a final hypothetical, the ALJ added that the individual: (1) could only lift and carry less than 10 pounds occasionally; (2) could stand and walk for less than two out of eight hours and sit for less than six out of eight hours; (3) could not understand, remember, or carry out simple instructions or perform simple work-related tasks; (4) could have no interaction with supervisors, coworkers, or the general public; (5) required two breaks of 30 minutes each to lie down in addition to normal breaks in an eight-hour work day; and (6) would be off task for 20 percent of an eight-hour day and would be absent four or more times every month.  (*Id.*).  The vocational expert testified that any of these limitations, with the exception of no interaction with the public, would preclude finding any work.  (*Id.* at 80).

### b.  Medical Records

On April 4, 2017, Traylor visited a nurse practitioner and reported several neurological and psychological symptoms, including: (1) decreased ability to concentrate 6-7 days a week; (2) feeling restless or fidgety, or moving or speaking slowly 4-5 days a week; (3) depression and feelings of hopelessness 4-5 days a week; (4) sleep disturbances including trouble falling asleep or sleeping too much 4-5 days a week; (5) loss of pleasure from usual activities 1-3 days a week; (6) wishing to be dead or to hurt himself or others

1-3 days a week; and (7) low self-esteem 4-5 days a week.  (D.E. 9-10 at 33).  However,

the records do not indicate any treatment for these symptoms.  (*Id.* at 31-35).  A return visit

on April 11, 2017, appears to indicate the same symptoms, although it is unclear.  (*Id.* at

25-26).[1]

Traylor indicated the following in a function report on May 3, 2019.  (D.E. 9-8 at

18-25).  He needed reminders to take care of personal needs and grooming.  (*Id.* at 20).  He

constantly worried about his heart disease and was afraid he would have a stroke.  (*Id.* at

21).  He went outside to go to doctor's appointments or to ride with his wife, but not often.

He only sometimes went out alone because he was afraid he would fall off his crutches or

have a stroke.  He shopped for food and water in stores.  (*Id.*).  He went to the store once a

week.  (*Id.* at 22).  He had difficulty getting along with others because he was antisocial.

(*Id.* at 23).  His illnesses affected his memory, concentration, understanding, ability to

follow instructions, and ability to get along with others.  (*Id.*).  He did not follow written

or spoken instructions well and did not get along with authority figures.  (*Id.* at 23-24).  He

handled stress and changes to his routine poorly.  (*Id.* at 24).

On June 6, 2019, Traylor visited Dr. Elva Camero and reported anxiety.  (D.E. 9-10

at 66).  Dr. Camero noted that Traylor had symptoms suggestive of generalized anxiety

disorder, but no official diagnosis.  Traylor was not being treated for anxiety at the time.

---

[1] The records on this date indicated both that Traylor had symptoms and that he did
not have symptoms.  For example, as to his concentration, the records say: "No decrease
in concentrating ability.  Decreased concentrating ability 6-7 days a week."  (D.E. 9-10 at
25-26).

(*Id.*).   The treatment plan was to avoid caffeine and reduce stress, and Dr. Camero prescribed Clonazepam.   (*Id.* at 68).

On June 20, 2019, Traylor visited Dr. Paul McCollum for a mental status examination.   (D.E. 9-11 at 47).   Traylor reported symptoms of anxiety, including social avoidance and upset stomach, and social anxiety, including social withdrawal, fear of meeting unfamiliar people, and fear of most social situations.   (*Id.* at 48).   The anxiety began several years earlier and Traylor was not sure what caused it to begin with.   He was initially treated with medication, but only for a short time, and the medication he received two weeks earlier had not helped.   (*Id.*).   Traylor reported that he had difficulty shopping due to his anxiety about being around other people and his physical impairments.   (*Id.* at 49).   He was often anxious and worried, and these symptoms seemed to be getting worse. Dr. McCollum noted that Traylor exhibited anxiety during the interview and his emotional expression was variable with heightened intensity.   (*Id.*).   However, he reacted appropriately to the interview questions and his emotional responses were congruent with his expressed mood.   (*Id.* at 49-50).   Traylor had a tense and anxious facial expression, but he had good eye contact and a positive attitude towards Dr. McCollum.   (*Id.* at 50).   His speech was spontaneous, goal-directed, and fluent.   (*Id.*).

Dr. McCollum further noted that Traylor could not count backwards from one hundred by sevens and could spell "world" forward, but not in reverse.   (*Id.*).   He appeared to have problems with distractibility.   Dr. McCollum asked Traylor to learn three words and recall the words later, but after a five-minute delay, he was unable to remember them. After a 30-minute delay, he could not remember Dr. McCollum's name.   Thus, Dr.

McCollum noted that his short-term memory was poor. Traylor also could not remember his address or what medications he had taken that morning, but he could remember what he had eaten for breakfast and what he had done the day before. He had difficulty with past dates and event sequences within his lifetime. Accordingly, Dr. McCollum noted that Traylor also had difficulty with remote memory. Traylor could give the correct month, but not the date or day of the week. He could name the right city and state, but not the floor they were on. Thus, he was seen to be oriented poorly to time, place, and person. He was able to name a river in Texas and the current president, but not the previous president. Dr. McCollum concluded that his overall intellectual functioning was low average. (*Id.*). Based on Traylor's responses to a proverb and a word pair, along with his general answers throughout the interview, Dr. McCollum concluded that his ability to think abstractly was fair. (*Id.* at 50-51). Traylor's response to questions indicated fair judgment and he had a fair insight into his mental health problems. (*Id.* at 51). He had good overall thought processing. He sometimes thought he would be better off dead but had no suicidal intent or plan. (*Id.*).

Dr. McCollum diagnosed Traylor with generalized anxiety disorder, adjustment disorder with depressed mood, and moderate alcohol use disorder that had been in remission for several years. (*Id.*). His psychological conditions were chronic with a fair prognosis, although the prognosis was affected by appropriate psychological and medical treatment. (*Id.*). He could understand, carry out, and remember one-to-two step instructions, but not complex instructions. (*Id.* at 52). He could sustain concentration and persist in work-related activity, but not at a reasonable pace. He could deal with only

8

minimal pressures in a competitive work setting and needed support from others to interact socially with supervisors, coworkers, and the public.  (*Id.*).

On June 24, 2019, Traylor visited Dr. Ramavathi Nandyala and reported anxiety and depression.  (D.E. 9-12 at 9).  However, he was alert and oriented to time, person, and place with an appropriate mood.  (*Id.* at 9).

On June 25, 2019, Traylor visited Dr. Muhammad Khan for a disability examination.  (*Id.* at 32).  Traylor reported depression since childhood.  He indicated that he got nervous and had panic attacks around other people.  He denied suicidal thoughts. (*Id.*).  He stated that he avoided socializing with people and felt sad almost every day.  (*Id.* at 33).  Dr. Khan noted that Traylor had a depressed affect.  His cognition and memory were normal.  (*Id.*).

On July 5, 2019, Traylor visited Dr. Camero and reported anxiety symptoms several times per week.  (D.E. 9-18 at 66).  The treatment plan remained stress reduction and avoiding caffeine, along with a prescription for Clonazepam.  (*Id.* at 67).

In a function report dated August 25, 2019, Traylor's wife stated the following. (D.E. 9-8 at 50-57).  Traylor slept most of the day.  (*Id.* at 50).  She reminded him to take his medications.  (*Id.* at 52).  He only went outside to visit doctors.  (*Id.* at 53).  He sometimes went shopping for food, but she did most of the shopping.  He went shopping once a month for around an hour.  (*Id.*).  He did not spend time with others and did not do social activities.  (*Id.* at 54).  His conditions affected his memory, concentration, understanding, ability to follow instructions, and ability to get along with others.  (*Id.* at 55).  He did not follow written instructions well, but could follow spoken instructions if

she explained them.  (*Id.* at 55-56).  He got along with authority figures "as long as they don't mess with him."  (*Id.* at 56).  He did not handle stress or changes in routine well.  She sometimes saw him get upset or depressed.  (*Id.*).

In a function report dated August 26, 2019, Traylor stated the following.  (*Id.* at 60-67).  He had panic attacks around other people because he thought they might be planning or trying to do something to him.  (*Id.* at 60).  He only left the house to see doctors or to ride with his wife.  (*Id.* at 63).  He went shopping for food with his wife but sometimes he waited in the car.  (*Id.*).  He did not spend time with others.  (*Id.* at 64).  He had difficulty getting along with others due to his anxiety.  (*Id.* at 65).  His conditions affected his memory, concentration, understanding, ability to follow instructions, and ability to get along with others.  (*Id.* at 65).  He did not follow instructions well and got along with authority figures "as long as they don't get crazy with me."  (*Id.* at 65-66).  He did not handle stress or changes in routine well.  (*Id.* at 66).

Traylor visited Dr. Camero on September 19, 2019, and reported the same anxiety symptoms as previously.  (D.E. 9-18 at 59).  The treatment plan remained the same.  (*Id.* at 62).  At a visit on October 11, 2019, Dr. Camero noted "[t]rue panic attacks apparently do not occur."  (*Id.* at 56).  The treatment plan remained the same.  (*Id.* at 58).  The same was true in November 2019, January 2020, February 2020, and March 2020.  (*Id.* at 59, 52-53, 55; D.E. 9-19 at 9, 11-12, 15).

On December 19, 2019, Traylor visited Dr. Nandyala and reported that he was having heart palpitations and a fast heart rate when having anxiety, but taking Clonazepam

helped.  (D.E. 9-18 at 3).  During the appointment, he was alert, oriented to time, person, and place, and had an appropriate mood.  (*Id.* at 4).

### c.  ALJ Decision

On May 15, 2020, the ALJ issued an opinion, concluding that Traylor was not under a disability since August 23, 2017.[2]  (D.E. 9-3 at 17-33).  At the first step of the sequential evaluation process, the ALJ concluded that Traylor had not engaged in substantial gainful activity from August 23, 2017, through his date last insured of June 30, 2019.  (*Id.* at 21).  At the second step, the ALJ concluded that Traylor had several severe impairments that limited his ability to perform basic work activities, including (1) left knee status-post remote lateral tibia plateau fracture with medial/lateral meniscus tears and osteoarthritis of the left knee; (2) obstructive sleep apnea; (3) hypertension; (4) obesity; (5) anxiety; and (6) depression.  (*Id.*).

At the third step, the ALJ concluded that Traylor did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.* at 22-24).  When considering the Paragraph B criteria, the ALJ concluded that Traylor had a moderate limitation in his ability to: (1) understand, remember, or apply information; (2) interact with others; and (3) concentrate, persist, or maintain pace.  (*Id.* at 23).  However, the ALJ concluded that he had only a mild limitation in his ability to adapt or manage himself.  (*Id.* at 24).

---

[2] The ALJ amended the onset date to August 23, 2017, because Traylor's previous application for disability insurance benefits was denied on August 22, 2017.  (D.E. 9-3 at 19).

The ALJ concluded that Traylor had the residual functional capacity to perform sedentary work, with the following additional limitations:

> After sitting one hour, he can stand 1-3 minutes without leaving his workstation, and then continue to alternate positions throughout the 8-hour workday.  The claimant must be allowed to wear a knee brace while at work.  The claimant requires a cane for ambulation.  The claimant cannot be required to ambulate on uneven or rough terrain.  The claimant can occasionally climb ramps and stairs with bannisters, but can never climb ladders, ropes, and scaffolds.  The claimant can occasionally stoop, crouch, and kneel.  The claimant can occasionally operate foot controls but cannot be required to operate a motor vehicle in order to perform his work.  He can occasionally reach overhead with the bilateral upper extremities.  The claimant cannot work at unprotected heights or around dangerous moving machinery, such as in a factory.  He can understand, remember, and carry out simple instructions and perform simple work related tasks, such as Specific Vocational Preparation (SVP) 1 or 2 work.  He can have occasional interaction with supervisors, coworkers, and no interaction [with] the general public, but he may be in the presence of the general public.  The claimant cannot perform work in a fast pace, high stress work environment requiring high production quotas.

(*Id.*).  The ALJ discussed Dr. McCollum's psychological consultative examination, finding his opinions partially persuasive.  (*Id.* at 28-30).  The ALJ summarized the tests performed during this examination and Dr. McCollum's conclusions.  (*Id.* at 29).  However, the ALJ stated that Traylor's treatment records did not indicate cognitive problems and noted that Traylor had no memory loss.  Moreover, the treatment records indicated that Traylor was alert and oriented with linear thought process, intact judgment, and normal thought content with an appropriate affect and behavior.  The ALJ also noted that Traylor reported shopping in stores for about an hour at a time on a monthly basis.  Thus, the ALJ stated that the RFC determination was appropriate.  (*Id.*).

When addressing the supportability and consistency of Dr. McCollum's opinion, the ALJ stated that his opinion that Traylor could understand, carry out, and remember one to two step instructions, but not complex instructions, was consistent with the mental status examination and therefore persuasive. (*Id.* at 30). However, she found Dr. McCollum's opinion that Traylor could not persist and concentrate at a reasonable pace to be unpersuasive, stating that Traylor never reported concentration problems to his treatment providers and that he was always noted to be alert and oriented with linear thought process, intact judgment, and normal thought content. Finally, as to Dr. McCollum's opinion that Traylor could handle only minimal pressures in a competitive work setting and needed support from others to interact socially with supervisors, the ALJ stated that this conclusion was unpersuasive because it was unsupported by anything in Dr. McCollum's examination or the other treatment records and appeared to be based solely on Traylor's own statements. (*Id.*).

Finally, the ALJ found the opinions of the state psychological consultative examiners to be partially persuasive. (*Id.*). However, the ALJ concluded that the record evidence as a whole supported only a mild limitation to Traylor's ability to adapt and manage himself, and that Traylor was more appropriately limited to occasional interaction with supervisors and coworkers and no interaction with the general public. (*Id.*).

At step four, the ALJ concluded that, based on his RFC, Traylor was unable to perform his past relevant work as a gate guard, which was medium work as performed with an SVP of 3. (*Id.* at 31). However, at step five, the ALJ concluded that, based on his RFC, age, education, and work experience, there were jobs that existed in significant numbers in

13

the national economy that Traylor could perform. (*Id.* at 31-33). The ALJ stated that, in accordance with the vocational expert's testimony, Traylor would be able to perform the requirements of occupations such as document preparer, cutter-paster, and surveillance system monitor. (*Id.* at 32). Thus, the ALJ concluded that Traylor was not under a disability between August 23, 2017, and June 30, 2019. (*Id.* at 33).

The Appeals Council denied Traylor's request for review of the ALJ's decision. (*Id.* at 2-4).

## III.  DISCUSSION

In his motion for summary judgment, Traylor contends that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate Dr. McCollum's consultative opinion. (D.E. 15-1 at 9). He argues that Dr. McCollum was a mental health specialist and that the ALJ improperly discounted parts of his opinion without providing specific reasons why. (*Id.* at 10-11). Traylor asserts that he consistently reported significant mental health symptoms to his doctors, which the ALJ ignored. (*Id.* at 11). He further argues that, contrary to the ALJ's statement, Dr. McCollum did not rely solely on Traylor's own statements to reach his conclusions, but rather conducted a mental status examination that showed several impairments. (*Id.* at 11-12). Traylor contends that the ALJ relied too heavily on benign mental status findings at his medical appointments, but ignored the symptoms that Dr. McCollum observed. (*Id.* at 12-14). Finally, he argues that the ALJ's failure to properly consider Dr. McCollum's opinion was harmful because Dr. McCollum identified significant work-related limitations that were not incorporated in the RFC determination. (*Id.* at 14).

14

The Commissioner responds that the ALJ thoroughly considered the medical evidence and appropriately assessed Traylor's impairments. (D.E. 16 at 6). The Commissioner asserts that the ALJ addressed the supportability and consistency of Dr. McCollum's opinions in the context of the medical record as a whole and explained why she found certain parts of his opinion unpersuasive. (*Id.* at 7-8). Thus, the Commissioner argues that the objective medical evidence supports the ALJ's RFC determination and supports only some of Dr. McCollum's identified limitations. (*Id.* at 8). Finally, the Commissioner contends that the ALJ's RFC determination was not required to mirror Dr. McCollum's opinions, but rather was required to take into account all of the medical evidence and resolve the conflicts within. (*Id.* at 9).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The burden has been described as more than a scintilla, but lower than a preponderance. *Id.* On review, the Court may not reweigh the evidence, and it is the ALJ's responsibility to resolve conflict in the evidence, not the Court's. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental

impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez*, 64 F.3d at 173-174; 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a); *Perez*, 415 F.3d at 461-62. When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 404.1545(a)(3). When creating the RFC, the ALJ must consider all a claimant's medically determinable impairments. *Id.* § 404.1545(a)(2). "[T]he determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a). The ALJ considers several factors when evaluating medical opinions, including: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors as applicable. *Id.* § 404.1520c(c). The most important factors when evaluating persuasiveness are supportability and consistency. *Id.* § 404.1520c(a). "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or

16

prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). "Consistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The ALJ must articulate how persuasive they find all of the medical opinions and prior administrative medical findings in the record. *Id.* § 404.1520c(b). The ALJ must address supportability and consistency, but the other factors are optional. *Id.* § 404.1520c(b)(2).

Here, the ALJ adequately discussed the consistency and supportability of Dr. McCollum's opinions, and her conclusion that parts of his opinion were only partially persuasive is supported by substantial evidence. As an initial matter, the ALJ was not required to adopt Dr. McCollum's opinion wholesale, as the ALJ does not defer to any specific medical opinion and the RFC determination is solely the ALJ's responsibility. *Taylor*, 706 F.3d at 602-03; 20 C.F.R. § 404.1520c(a). Instead, the ALJ was required to consider Dr. McCollum's opinion and determine whether it was supported by and consistent with the evidence as whole. 20 C.F.R. §§ 404.1520c(b), 404.1545(a)(3). The ALJ properly did so regarding the two of Dr. McCollum's opinions that she found only partially persuasive.

First, substantial evidence supported the ALJ's conclusion that Dr. McCollum's opinion that Traylor could not concentrate and persist at a reasonable pace was only

partially persuasive.  As noted by the ALJ, there is little medical evidence in the record regarding Traylor's ability to concentrate and maintain pace.  Traylor was reported to be alert and oriented with linear thought process, intact judgment, and normal thought content. (D.E. 9-12 at 9; D.E. 9-18 at 4).  Traylor reported difficulty concentrating at an April 2017 appointment with a nurse practitioner, along with other problems, but the records do not indicate that he received any treatment.  (D.E. 9-10 at 31-35).  The records do not indicate that he ever reported concentration problems to any of his treatment providers after this. Although the April 2017 records do create a factual issue in comparison to the later, unremarkable medical records, it was the ALJ's responsibility to resolve this conflict and this Court cannot reweigh the evidence.  *Martinez*, 64 F.3d at 174.  Notably, the ALJ still included some limitation related to Traylor's ability to maintain pace in the final RFC determination, concluding that he could not "perform work in a fast pace, high stress work environment requiring high production quotas."  (D.E. 9-3 at 24).

Second, substantial evidence supported the ALJ's conclusion that Dr. McCollum's opinion that Traylor could handle only minimal pressures in a competitive work setting and needed support from others to interact socially with supervisors was only partially persuasive.  As noted by the ALJ, although Dr. McCollum conducted several tests during the examination, none of these tests addressed whether Traylor could be around or interact with other people.  (*See* D.E. 9-11 at 50-51).  Traylor reacted appropriately to Dr. McCollum's interview questions and, although anxious, had good eye contact, a positive attitude toward Dr. McCollum, and his speech was spontaneous, goal-directed, and fluent. (*Id.* at 49-50).  Although Traylor reported difficulty being around other people, this was

18

not reflected in the medical records.  Dr. Nandyala noted that he had an appropriate mood. (D.E. 9-12 at 9; D.E. 9-18 at 4).  Dr. Camero noted that Traylor apparently did not have true panic attacks.  (D.E. 9-18 at 56).  Traylor also reported to Dr. Nandyala that, although his anxiety sometimes caused heart palpitations and a fast heart rate, taking Clonazepam helped.  (*Id.* at 3).  Based on this evidence, substantial evidence supported the ALJ's conclusion that Dr. McCollum's opinion regarding Traylor's ability to be around others was only partially persuasive.  Notably, again, the ALJ's ultimate RFC determination still included a limitation that Traylor only occasionally interact with coworkers and supervisors, and never with the general public.  (D.E. 9-3 at 24).

Accordingly, substantial evidence supported the ALJ's discussion of Dr. McCollum's opinions, specifically her conclusion that two of his identified limitations were not consistent with or supported by the record as whole and were therefore only partially persuasive.

## IV.    RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Traylor's motion (D.E. 15) be **DENIED**, the Commissioner's motion (D.E. 16) be **GRANTED**, and Traylor's cause of action be **DISMISSED**.

Respectfully submitted on August 17, 2022.

Julie K. Hampton
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).